Good afternoon, everyone. We're here in appeal number 25-3050, Nava v. Department of Homeland Security. Mr. Ensign, whenever you're ready. Good afternoon. May it please the court, Drew Nava v. U.S. Department of Homeland Security. I'd like to reserve four minutes for rebuttal. The district court's orders violated the applicable law and constituted abuses of discretion. Both orders violate section 1252F1's bar on granting class-wide relief for covered provisions, which sections 1225 and 1226 incontestably are. In particular, the November order mandated the release of aliens on a class-wide basis. Mr. Ensign, can I ask you about mootness? Is there any mootness issue here? How many more days are left on this order, assuming that the order is extended? And then what's going on regarding enforcement in the district court? How does that extend the life of this case? I think mootness comes in a couple potential angles, so let me take each one. I think the November order's validity doesn't expire under its own terms, and so I think that in November order it would be in front of you kind of under all scenarios, although this court could resolve it as it has simply by saying the consent decree doesn't authorize it. As to the extension, that would have expired yesterday. Our understanding is that points has filed a motion to enforce the consent decree on Friday, so two business days before the argument. Then last afternoon or evening, the district court said, based on its interpretation, the consent decree was automatically extended. We don't agree with that interpretation of the consent decree, so that will be actively litigated below. I think that the November order's validity does turn on the October order, although if you resolve the November order otherwise, I don't know that the October order is in front of you and that it's expired under its own terms. There is an extension, but I think that could be brought to you by separate appeal. I don't know that it maintains its existence. More specifically, if the district judge extends the October order, let's say he holds a hearing in the middle of February or end of February and extends it for two weeks and then it expires and we've not issued an opinion yet, so now we're in the middle of March, do potential enforcement actions under the expired consent decree extend sort of the validity of our ability to decide the appeal? Or at that point, once the injunction or the consent decree expires, is that the end of it, including with respect to enforcement matters under the consent decree? So I think the October order would lose its relevance on its own terms, but because the November order's validity turns on the October order being valid, it could still potentially be a live issue if you didn't resolve the November order in a different manner. Okay, thanks. So the November order suffers from two additional defects, aside from 1252F1, that we think are particularly important here. First is this panel already properly recognized. The release order violates the consent decree by awarding relief without actually finding violations. Instead, the district court allowed mere suspicion to suffice, explicitly grounding its reasoning on its belief that, quote, it stands to reason that a significant number of additional violations will be uncovered, end quote. That's at 108. That stands to reason conjecture is not sufficient to prove violations under the consent decree and is not a valid basis for granting relief. Is that the subject of additional hearing before district court, that is the individual determinations? It potentially could be, but I don't believe that is in front of you. I think what you have in front of you that it continues to be valid is an order to release these individuals in this subset based on nothing more than suspicion that maybe there'll be violations if you go poking around there. And I think an educated hunch might be enough for a reasonable suspicion in a Terry stop, but it's not enough to satisfy their burden, certainly under a preponderance of the evidence, which would govern here. I guess going to Judge Kirsch's concerns about mootness, I guess I was wondering if the district court, after looking at the preliminary order, said, you know what, okay, I'm not going to release those people. Let's do individual inquiries with regard to all of these people who are detained. I don't believe that's occurred. Certainly you can press plaintiffs if they want to say we're no longer pressing for release under the November order. That's a development we would be delighted to hear and would happily accept that as a fully sufficient basis to resolve that aspect of this appeal. Second, the release order violates section 1225's mandatory detention requirement, which is explicitly incorporated by reference into the consent decree. Under section 1225A1, all aliens for admission who have not been admitted to the United States are deemed, applicants for admission, end quote. Subsection B2 then mandates detention for aliens that are seeking admission, which applicants for admission necessarily are by virtue of their application for admission that's pending by operation of law. Furthermore, subsection A3 makes this explicit by providing that, quote, by, excuse me, mandating inspection for, quote, all aliens, dot, dot, dot, who are applicants for admission or otherwise seeking admission, end quote. And as this court recognized in the Cleaver case, the, quote, or otherwise language operates as a catch-all. The specific terms that precede it are meant to be subsumed by what comes after it, end quote. That's 914F3 at 483. The, you know, the task of statutory interpretation often requires us to look at various data points and see if we can discern some constellation from the various stars that are out there, one being, mainly being the text of the statute, but other being kind of the historical background and the framework on which the statute is based. The appellee's point to the legislative history, the conference committee reports from the House with regard to this particular provision that is section 1225B, and in it, it states that new section 25B, which is 1225B, establishes a new procedures for the inspection and in some cases, removal of aliens arriving in the United States. What are we to make of that? Well, certainly, Your Honor, legislative history is a dangerous ground to tread upon, particularly for statutory interpretation, to the extent the text could be considered ambiguous, which we don't think it is. That is one piece of legislative history. I think the weight of legislative history, excuse me, overwhelmingly points the other way. In particular, as the Ninth Circuit... I guess my question is, do you have a particular response to that reading of that particular passage in the legislative history? I do, Your Honor, and I think it is, particularly the Ninth Circuit recognized as much in Torres v. Barr, which said that the upshot of the legislative history of IIRO was to, quote, ensure that all immigrants who have not been lawfully admitted, regardless of their physical presence in the country, are placed on equal footing in removal proceedings under the INA. That is a severe problem with point of interpretation, which would have precisely the sort of perverse rewards that Congress sought to eliminate in IIRO. Specifically, under their view, aliens who lawfully present themselves at ports of entry would be subject to mandatory detention under Section 1225. But aliens that unlawfully barge past our borders, thereby committing the crime of illegal entry, have adversely possessed the right to bond hearings by of their criminal entry. And that sort of perverse reward for breaking United States laws is precisely one of the core purposes that Congress had in enacting IIRO in 1996. But hasn't the Supreme Court recognized that people who are here unlawfully, unlawful aliens, once they are in the United States, at least have some due process rights that aliens who are outside the country do not? Generally, no, Your Honor. The entry fiction... Isn't that the whole... Recently, the Supreme Court has talked about due process before removals, et cetera, et cetera, 48 hours. And are you saying that the aliens who are unlawfully here have no such due process rights, contrary to what the Supreme Court said? Can you kind of comport your understanding right now that unlawful aliens have no rights under the Constitution whatsoever with what the Supreme Court has kind of stated recently? So a couple of different responses, Your Honor. So I believe you're probably referring to the AARP decision, which is involving Title VIII in the Alien Enemies Act. The Congress... Sorry, the Supreme Court has spoken much more specifically as to Title VIII and due process rights, particularly in the Thurisigium case, although going all the way back to Nishimura and Kaplan along the way. So we think Thurisigium is the key place to look. The entry fiction makes clear that the dividing line for due process purposes is lawful admission into the United States. If you've been lawfully admitted, you can start acquiring additional due process rights beyond what is provided for by statute. But if you have not been lawfully admitted, then you have only, as a matter of due process, you have only those procedures that are provided for by Congress. I think the Supreme Court's decision in Kaplan is particularly instructive on this point. There you had someone who lawfully was paroled into the country, but not admitted. She was in the United States for eight years. She lived in the interior of the United States with her naturalized citizen father. But after her parole was revoked, the Supreme Court said her due process rights were only those provided by Congress and nothing further, even though she had been in the United States in the interior and lawfully paroled, no less, for, I believe, eight years. And so that's the governing principle in terms of acquiring due process rights. The Supreme Court reiterated that again in Landon versus Plasencia, where it said, this court has long held that an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, dot, dot, dot. Once an alien gains admission to our country and begins to develop ties that go with permanent residence, his constitutional status changes accordingly, end quote. And so that is the key dividing line. Once you've been admitted into the United States, you may start acquiring additional procedures beyond that which Congress provides as a matter of the due process clause of the Fifth Amendment. But until you have lawful admission, Thursogian makes clear that whatever the political branches have provided in terms of process is what the due process clause requires and no further. Um, so, Dr. Ensign, you're in your rebuttal time. If you want to reserve some time, I just want to let you know. Thank you, Your Honors. I will do so. Okay, Ms. Wick. Good afternoon, Your Honors. May I please support Karen Zwick with the National Immigrant Justice Center on behalf of plaintiffs? Before I dive into the 1252 F1 issues, I do want to reorient this court, though I know that Your Honors have all, um, are quite familiar with this case from the state decision, um, to the facts that led to the extension. In particular, I want to remind the court that the reason, one of the reasons that the district court gave for enjoining, or for extending the, uh, consent decree as a set issue in this case was because the defendants unilaterally on June 11th canceled the decree while the motions to enforce were pending. Um, and then when the district court told the, told the government that, that a motion to extend or modify, continue the application of the decree, which the government is now saying they, they do not agree with, but they have not made that argument really anywhere until right now, including in their briefs. Um, they, the government did not change their course and, in fact, they did the opposite. They launched operation. Ms., I, let me ask you a question about mootness, okay? At some point, this consent decree is going to expire. I mean, we're near the end, okay? I, I think we're near the end, no matter how many short extensions we get. At least when the judge extended it, I think for 118 days, clearly some of those days have expired. I know there's a motion to extend it further, but once the consent decree expires, is that the end of this case? Yes. I mean, let me follow up on that because I think the, I think, but am I, am I wrong? Tell me if I'm wrong on this. Once the consent decree expires, you can't file motions to enforce the consent decree that is expired. In other words, the individual detainees can pursue individual claims that they've been arrested in violation of the law, but it wouldn't matter any longer if they had been arrested in violation of the consent decree. Is that right? Once the consent decree is actually over, yes, we would, we certainly can't file more motions once the decree is over. The decree has an expiration provision that says that it expires unless there is a pending motion for repeat material violations. The fact that the decree continues to be ongoing is because the defendants... No, I know, I know, but I'm talking about the current enforcement actions that are pending now in front of the district court, like with respect to the November orders. Once the consent decree expires, do those pending enforcement actions in front of the district court with respect to individual defendants also end and terminate and that's the end of it? The consent decree does not expire until those motions are resolved. And so once those motions are resolved, then the consent decree will expire. So the consent decree doesn't expire until the judge rules on all of the pending motions regarding violations. The termination provision of the decree says that it will terminate automatically absent, i.e. except in the case of a pending motion to enforce the repeated material violation. No, I know, but right now, the last order we issued told the district court to make individual determinations on hundreds of detainees. And I think that that's going on in the district court, right? Sort of, yes. What happens to those individual determinations once the October order expires, whether it be in February or March or April? What happens? Is it at the end of it? So I think that we will continue to, regardless of what the outcome of this court's opinion is, any violation that happened before October 7th, I think we would probably still have some grounds to continue resolving disputes if they predate whatever this determination is. Based on what? If the violation occurred while the consent decree was live, we would have to resolve those disputes. But what would be the potential remedy? Once the consent decree is resolved, could the judge resurrect a dead decree? I think that if a person was violated while the decree was live, even if the passage of time, yes, I think the resolution of those individual cases would continue to go forward until they are... We might not be able to bring any new cases. I don't think we would be able to bring new cases, but I think that any case that was pending before the expiration, yes, they would resolve those. So your position would be that the judge would decide the enforcement issue, not under the existing law, but under the terms of the consent decree, to the extent that they were different. I know you're not... I'm not trying to... This is not a trick question or anything. The judge would decide the issue under the consent decree, not under what the judge believed to be the correct interpretation of the law. Well, as I think Your Honor alluded to in your premise of the question, I don't think that we see very much daylight between those two things. So I think that the answer is that the court would adjudicate disputes that we would bring to the court's attention as a result of the decree, as violations of the decree even, and they would be resolved under the law, which is the decree. Our view is that that is under the provisions of the decree. But if they were different, could the judge resolve them under the terms of the consent decree, or would the judge have to go to the law as it existed currently? I think so, because another provision of the decree prohibits the defendants from changing their policies or changing the practices of the decree while it is pending. So for example, the June 11th rescission was a violation because the decree itself says that they can't, the government can't unilaterally change its rules midstream. And so they can't, any rule that was existing at the time of that person's arrest, if it was contrary to the decree and the underlying policy, it would be a violation of the decree. You see where I'm going here is with my separation of power concerns, which I talked about in my motion to stay, because if there were an administration that entered into a decree with favorable parties, and then there were enforcement actions that were, it could extend the decree for a very, very long time to sort of embed the policy preferences of a prior administration on the current administration. I can appreciate your concerns, and I certainly am aware of them from our previous dialogue about them. I don't think they are present in this context because there are many other options that the government has. For example, the government could have filed their own 60B motion to end, to terminate this decree on their own behalf. The decree itself has a provision in it for early termination. They did not seek to invoke that. They have many opportunities to make their own objections known, and the separation of powers concerns just simply aren't in place here for those reasons, in addition to the fact that, of course, this- But they could, but they don't have to. I mean, you can imagine a future administration thinking that a consent decree is just going to expire, and they wait for their expiration, and then two days or a day before it expires, the government goes in and files a bunch of motions for enforcement of the consent decree, which, by the terms of the consent decree, extend the consent decree for a very long time. The government did not have to agree to this extension provision that allowed for the consent decree. But it's not the government. It's the Biden administration. It's not the mayor. It's Mayor Johnson. It's Mayor Lightfoot. That's a big- And you say the Trump administration, Trump won, began negotiations. Who cares? What does it have to do- The Ford administration, the Reagan administration, it makes no difference. Trump won is different than Trump, too. I hear you, Your Honor, and I say the government because I think that in the context of immigration, we need to have some consistency in how our immigration policies are treated from one administration to the next, and I think that that is an important thing that I think we all have an interest in. I don't think I'm going to satisfy you on this question. I just don't think that I'm going to change your mind. No, I know on the separation of powers issue, but I'm interested regarding the expiration of the October order, sort of what happens, meaning is there any reason for us to decide this case, or are we just issuing an advisory opinion on some thorny issues, right, like the interpretation of 1225 that courts are weighing in on now, and I don't think there's been an appellate court that's weighed in on what 1225 means yet. So I think as it pertains to the order, I think the ATD portion of that order can be likely, I don't want to say that we want to walk away from it as my friend suggested that we maybe do, but it is certainly way less relevant at this point because, as Your Honor alluded to, we have been engaging in ongoing dispute resolution since the court decided the stay decision, and so many of those, that what started off as 1800 people is now fewer than 200 people, and we are continuing to resolve those on an individualized basis fully on the merits and without any interim, the ATD order, you'll recall, was an interim relief order, and so there's no need for interim relief in that same way because we are engaged in dispute resolution processes as it relates to that thing. There are other things, however, that do remain important that I think that we think the court does need to resolve, including, for example, the 1225, the detention authority question. Can we go back just a moment? You were setting us up factually as to kind of where we are today. When we had previously heard oral argument on the motion, we wanted to know how many of those individuals that were identified as arrested without warrants, irrespective of the I-20 field warrants, how many remain detained? So of the total population of people who are arrested in, for example, during Operation Midway Blitz, which is around 4,000 people, I think that what we would say is that a substantial percentage, we don't have the precise numbers, a substantial percentage, perhaps the majority of those individuals were arrested without an I-200 that was of any kind or any kind of warrant. They were purely warrantless arrests because the government stopped trying to comply with the making arrests that were purely warrantless without any regard to any I-200 issues. And of that population, the government has estimated at one point in their briefing that approximately 85% of people are subject to this 1225, 1226 dispute about who's subject to mandatory detention. So a substantial portion of people would still be detained. I can give you some numbers, some hard numbers that I have, but the thing is they do fluctuate basically daily because the government produces new, we're still negotiating about violations on a regular basis. Because we're somewhat in a celebratory position, I think it might be more helpful, let me make it a little more pointed. You represented that there were approximately, as far as when Judge Cummins was hearing, making this ruling on the motion to modify the consent decree under Rule 60, there was a question as to whether or not there had been warrantless arrest. And the department, as well as the plaintiffs, agreed there were approximately 20. When you presented before us, there were 13 that were remaining. And those 13 that were remaining, as I understand it going into the November hearing, was now they're being detained pursuant to 1225. Judge Lee asked the question regarding what process is due to those 13. So of those 13 individuals who were referenced in the November order, I think all but one of them have been released. I'm not sure if that's answering your question, but they have been released. And so regards to Judge Lee's question, can you address the question in respect to whether or not looking at those that are within the country, and the Leighton case, I believe, is the one your colleague on the other side referenced, as to whether or not there is process that is due to those individuals? So our position is that any person who is arrested inside the interior of the United States should be eligible for a bond hearing under 1226A. There, the government obviously is taking the opposite position in saying that they don't think that those individuals qualify for bond hearings. We think that that's wrong. So the process that should be due to those individuals is that they should be eligible at minimum for release pursuant to a bond hearing. Ms. Wick, can I ask you about 1225B2A? Assuming that the government is right, let's just assume that the government is right, that people who are unlawfully within the United States are subject to 1225B2A. B2A states that an alien who is an applicant for admission shall be detained if the examining immigration officer determines that an alien seeking is not clearly and beyond a doubt entitled to be admitted. Do you know whether that agency determination has been made with regard to the people the government is purportedly holding under this provision? No. I think our understanding is that that determination is not occurring because that provision was written to apply, was meant to be applied at the border on the threshold of entry, and people who are arrested in the interior do not receive such a determination. And I'll ask Mr. Ensign this too. So the government at least has not represented to you that that prerequisite agency determination has been made at any point? That's correct. If I may just say a few brief words about I-200s that are issued in the field because that was an issue that was very important last time. Before we get there, I'm sorry, we have to go back to this point because I'm still waiting for you to articulate, other than the other side got it wrong, what is the law that supports your argument? If we take the statutory text. 1226A says that a person who is present in the United States and who is arrested in the interior of the United States can receive a bond hearing unless they are subject to the exceptions that are outlined in 1226C. The government's position is that 1226A only applies to people who have been admitted into the United States, but that position is incorrect because 1226A specifically references 1226C, and 1226C in turn references people who are subject to mandatory detention on the basis of being inadmissible. In other words, 1226A provides a clear provision for at least at minimum bond hearings, and 1226C clearly references an exception to that that is based on grounds of inadmissibility, and the government's position reads all of that out of the INA. The government's position is basically that any person who is inadmissible cannot receive a bond hearing under 1226A, which is completely contrary to the structure of that statutory provision. It's also contrary to the Supreme Court's decision in Jennings, which acknowledged the difference between, specifically acknowledged the difference between the arrest of people at the border versus in the interior. I see that my time is up. May I say one or two brief things about I-200s? Yes, you may, but let me ask you this. The advocacy in this case has been outstanding, okay? The briefs are excellent. So are there things you want to say that are not in your brief? Go ahead. I'm going to let you make your points, but we've read your brief several times. I promise I will be quick. So I just want to make sure that it's clear that our position on the I-200 issue is that that issue was resolved with respect to individual disputes. So the plaintiffs in their motion to enforce brought a handful of individuals, and the district court reached that question as it results to individuals. 1252F1 does not bar individual injunctive relief. It only bars it on a class-wide basis, but the district court did not give any injunctive relief on a class-wide basis. The district court only- But didn't the Supreme Court expressly reject such an argument in Aleman-Gonzalez? I mean, when he talked about individual individuals, et cetera, et cetera, and then the dissent kind of talked about this problem? Not exactly. What was happening in Aleman-Gonzalez was a declaration about class-wide, individualized class-wide relief. This was specific individual motions that we brought to enforce on behalf of certain individuals, so I think it's a substantial difference. But even if the individualized determinations don't matter, the other thing that I want to say about the I-200s is that if it's injunctive relief, it's only asked of those individuals. If it's something more than injunctive relief as to individuals, it's nothing more than declaratory relief. In fact, we asked the government, we asked the court, Judge Cummings, to give us an injunction, and he didn't. He only gave us declaratory relief, and 1252 F-1 does not bar declaratory relief, so as a legal matter, there was nothing barring Judge Cummings from resolving the individual disputes and then stating as an individualized matter for declaratory purposes that that was okay. And then finally- Was it wrong then to use that reasoning to modify the consent decree? Did he go beyond that declaratory relief when he used that as a basis to extend it by 118 days? That's a great question, Your Honor. Thank you. I think the answer is no. So our position is that the judge was well within his right. A motion to modify a consent decree has to be based on changed circumstances, and the judge was well within his right to resolve, in fact, he was obliged to resolve the individual disputes, and then he could rely on that observation. Relying on an observation that something was illegal is not the same thing as enjoining that thing. And so I think that the fact that the judge provided that as a rationale does not result in an abuse of discretion as to the overall expiration. My question was a little more nuanced than that. Not whether or not it was an abuse of discretion, but I wanted to pull the thread on your representation that the relief he extended by classifying those IFA warrants as warrantless arrest, but then using that rationale to extend the consent decree, did that turn that relief, the extension of the consent decree, was that injunctive relief? No, Your Honor. I think it was just one reason, again, two different reasons that the court gave. And as Your Honor said in the state decision, even setting aside that piece, even if you only rely on the unilateral rescission of the June 11 of the consent decree, that by itself would have been freestanding and sufficient. And there are plenty of, I don't have one at the top of my tongue, but there are plenty of cases from this court and others where when discretionary decisions are based on a number of factors, even if the court disagrees with one of those factors, as long as the remaining factors are sufficient, the overall decision wouldn't be an abuse of discretion. Okay. Thank you very much, Ms. Wick. Mr. Ensign. Thank you, Your Honors. Five quick points, if I might. Mr. Ensign, could you answer the question that I pre-told that I would ask you, which is 1225B2A's requirement that, or the condition, if the examining immigration officer determines an alien-seeking mission is not clearly and beyond a doubt entitled to be admitted. For those individuals that the government has detained who are unlawfully in the United States under that provision, has that predicate determination been made? I believe so, Your Honor. I'm not... In what has been written down? I mean, in what context has that been written? I think it's in the context of the overall process that leads to the stop and ultimately arrest. So, for example, and I think that varies quite a bit, but for example, if you produce a passport and say, I'm a U.S. citizen, that 7-1-1 will be released. If you say, I'm an LPR, here's my green card, that is going to result in your release. And so I think that process of the people that remain are those that have not been able to prove their lawful status in the United States, and that's how they fall within the scope of... I see. So the examining immigration officer under that structure would be the officers who are detaining the individuals on the street or workplace or wherever they're being detained? The arresting, and then I think... I don't necessarily think that's the end of the process too. I think if you subsequently come up with evidence that you have lawful status in the U.S., that certainly doesn't cease to be irrelevant, or cease to be relevant, I should say. Do you know whether there's a particular document of some sort that the agency uses to make this particular finding? I don't know that offhand, Your Honor. I can try to look into that and report back. I don't know offhand. I think there are potentially several different ones. I think they create an A file, for example, or they may already have an A file that gets annotated as a result of that. I don't know the specifics on it, but there are procedures, but I can't speak too well to the specifics of them right now. Do you know, and perhaps... I don't really expect you to know the answer to this question either. Do you know with regard to inspections at the border whether there's a particular form that documents an immigration officer's determination about this particular issue? Possibly, Your Honor. What typically comes up more commonly, it's not a dispute about lawful status at the border. What's much more common is someone will assert a credible fear, and there absolutely is a form that's produced with that that asks questions that are designed to elicit information related to whether or not there is such a credible fear. And if you convince an IJ, a supervisor, sorry, an immigration officer, a supervisor, or an IJ that there is such a credible fear, then you get referred to Section 240 proceedings. So certainly there is that process. I don't know if they use a separate form for admissibility as well or what those processes are, but there certainly are such processes. They're conducted probably millions of times a day at ports of entry all over the United States. Okay. Thank you. If I may, down to four quick points at least. First, I think the end is likely in sight here, and so the consent decree is likely to end soon, which would likely moot any challenge to the November order. And I think that there's reason to believe that that may happen very soon, which really diminishes the need for appellate review of that question. As to the November order, I think that can be resolved quite simply, as this panel already has, by recognizing that that was based on a suspicion rather than actual proof of a violation, and therefore that November order is invalid under the terms of the consent decree itself, and that eliminates any need to go further. I believe opposing counsel has even acknowledged that this case has much less practical significance, and that practical significance is diminishing by the day as the dispute resolution processes do their work and continue to diminish the number of people at issue here. Second, I believe opposing counsel referred to Jennings. I think Jennings is quite instructive. I will tell you it has dicta for both sides, but here's what I find quite useful and instructive here. Jennings said, quote, read most naturally, sections 1225B1 and B2 thus mandate detention for applicants for admission until certain proceedings have been concluded, and that's 583 U.S. at 297. That is the Supreme Court expressly saying those provisions mandate detention for all applicants for admission. I'd also commend to this court to you the district court decision out of Oklahoma, the Montoya decision, I think has a uniquely good way of walking through these provisions. It's probably the best one I've seen, and it may be helpful to this court. Third, I think the November order is clearly class-wide relief. It was based on a class-wide hunch, and it was not individualized, and therefore we think it is certainly class-wide as this court previously recognized. And with that, if there's any further questions. Okay, thank you Mr. Ensign. As I said earlier, thank you both to both counsel for the excellent advocacy in this case. It's very helpful to the court. The case will be undertaken under advisement. It will be in recess until tomorrow morning.